It looks like we're ready. Go right ahead. Thank you, Your Honor. Tim Bechtold on behalf of the appellant, the Center for Asbestos Related Disease, which I will often refer to as CARD. I'd like to reserve three minutes for rebuttal, if I may. So after the asbestos problem in Libya was discovered back in 1998-1999, the ATSDR established a screening program, and CARD was part of that screening program. What happened was is that CARD would diagnose people with an asbestos related disease, and then there had to be a confirmatory outside read before that person was eligible for the medical treatment provided by the DHHS, Department of Health Human Services. In the alternative, there could be two outside reads that would enable someone to have that medical care. And when Congress started to consider developing an Affordable Care Act, Max Baucus came to the CARD clinic and said, how can we make this permanent so we're not subject to a series of revolving budgetary issues with DHHS, and how can we make it easier for people to get screened? And working with the CARD clinic staff, they established the language of what became the ACA Libya provision, which is that CARD would have a diagnosis, and that diagnosis would qualify someone for Medicare, permanent solution. Or instead of having two outside reads, you only needed one. And can we deal with the language of the statute for a moment? We sure can. I'm trying to figure out precisely what your position is. You do agree that the people who are eligible for lifetime Medicare have to be diagnosed with one or more of the conditions?  And you also agree that CARD readers don't diagnose? You've agreed to that? Well, CARD readers... B readers. B readers don't diagnose. Forgive me. Well, what B readers do, according to the statute... You've agreed. My question is, I think you've gone on record that B readers do not diagnose. They make an interpretation. So the answer to my question is yes. You've agreed to that, right? B readers do not diagnose? B readers do not diagnose. Okay. It wasn't a trick question. It's just there's a lot packed in here. Go right ahead, Judge Hurwitz. So we're working in tandem. No, I don't mean to. We're getting precisely to the question I have. With respect to the 112 B readers that were at issue in this case, I'm having trouble figuring out who diagnosed one of the qualifying conditions because the stipulated facts say that CARD's physicians went to these people and said, we haven't diagnosed you with one of these conditions, but you do have a B reader report, and therefore you're eligible. But since you've stipulated that a B reader report is not a diagnosis, tell me where the diagnosis is. CARD never made it, and the B reader can't make a diagnosis. And so in short, that's my difficulty. Help me with that. Well, the issue there is that the definition of what a diagnosis is happened during trial. Well, now let's assume any definition you want. A says you have to be diagnosed. You've stipulated that the B reader didn't diagnose, and you've stipulated that the CARD physicians said to these people, we don't see evidence of this, but the B reader does. That's right. And so the CARD physicians didn't diagnose either. So whatever the definition of diagnosis is, who diagnosed? Well, the statute says, and let's look at the language of the statute. Well, no, but first answer my question. Who diagnosed? Yeah, who diagnosed? Well, according to the district court, nobody diagnosed. Well, tell me who did, according to you. Well, see, this is an issue with the CARD physicians. So they say, and this is an issue all along, their premise was we diagnose because a diagnosis is a clinical finding. However, pursuant to the statute, you don't need a diagnosis because the statute says it's outside. Well, I understand that's your legal position. And if your legal position is you don't need a diagnosis, then we should deal with that. But I'm trying to figure out whether you contend there was a diagnosis. Well, pursuant to the CARD physicians' interpretation of the word diagnosis, no, these people were not diagnosed. However, what they always said is we didn't give a diagnosis, but the statute says that the diagnosis is established by interpretation by a bee reader. Okay, so tell me, so this is helpful. So your case really rests on the notion that the bee reader's interpretation suffices as a diagnosis under the statute. Correct. So if you look at Wait, wait, wait. Before trial, you said that the definition of diagnosis was resolved at trial. Before trial, at SCR 101, there's another stipulated fact. In order to satisfy the ATS criteria, a diagnosis of ARD must include structural pathology, causation, and exclusion of other possible causes. That was stipulated by both parties long before trial, sir. Exactly. That is what a diagnosis is according to the physicians. Well, and you stipulated to this, and you stipulated that that's what CARD does. That's what CARD does, but that's not what the statute requires. So your argument is really then not based, it's based entirely on your reading of the statute. Correct. Okay, so even if the CARD doctors didn't diagnose, and even if the bee reader doesn't diagnose, you think that under the statute, the bee reader's interpretation of the radiograph is sufficient to establish Medicare eligibility?  Okay. That's exactly right. Tell me why you think the statute says that. Well, if you look at subparagraph 1 of Section 1881AE, it says, for purpose of this section, the term environmental exposure affected individual means A, an individual who is diagnosed with one or more conditions described in subparagraph B. And then you go to subparagraph B, and it says conditions described. For purposes of subparagraph A, the following conditions are described in this subparagraph. Yeah, and see, I'd have no difficulty with that position if you were arguing that the bee reader's reading of the X-ray was a diagnosis. But you seem to have given that issue away, and that's why I'm having difficulty rounding the circle, if you will. And this comes down to semantics that the physicians at the CARD Clinic insisted upon is to say, we're making a diagnosis, a clinical diagnosis, that's what we do. They're making a radiographic interpretation. But under the statute, you know, we doctors think that we're making a diagnosis clinically, but under the statute, that radiographic interpretation counts. This is not a case, I think, and you can help me if I'm wrong on this. None of the CARD physicians said, well, I've looked at those X-rays too, and now that I've looked at them, I do diagnose one of the qualifying conditions. No, that's correct. They did not make that finding. So I guess this leads me to the question that maybe you weren't the trial counsel, but why stipulate that the B-readers don't diagnose? Because, again, this is the personal feelings of the CARD physicians, that a clinical diagnosis is different than a radiographic interpretation. They insisted upon it, but that's what I was forced to deal with. Oh, please go ahead. Sorry. Go ahead. I just want to call your attention to and have you walk through this EHH checklist.  We've got this several times, as you know. I think it was Exhibit 2. My exact question. Oh, apparently we're going to the same exhibit. But you've stipulated about what B-readers do or do not do, and you've stipulated about what a diagnosis is under the standard by the ACS. So on this form, and these were signed by the head of the CARD clinic, this is what qualified somebody for Medicare, as I understand it. The form talks about Step 1 is identifying the patient. Step 2 is the evidence of structural pathology, and somebody's going to check a box or not check a box about whether there's asbestosis or pleural plaques or what have you. Correct. Right? And then Step 3 is the exposure requirement from the statute. Correct. Right, both geographic and temporal exposure. This form doesn't satisfy the third part of the ATS requirement, about ruling out any other causes. We don't see that here. That is correct. Right. So if there were another step in the process, perhaps, I could understand your position. But otherwise, I can't square this. I guess you're rounding circles and I'm squaring boxes. But anyway, I can't get from here to compliance with the statute even under your client's read. To make a diagnosis, you have to rule out other causes. Correct? Right. Right. All right. So a radiographic interpretation doesn't do that. Right. And it's not required for Medicare under the Act. Right. So on this form, I don't think there's another form after this one, after this. This is it. This is it. And it doesn't, even it doesn't evidence all of what you stipulated is baked into a diagnosis. That's right. Because what this is for is just, it's not for making a diagnosis. It's just for whether you qualify under the Act. Well, you certainly agree you have to have a diagnosis in order to qualify under the Act. Excuse me. For making a clinical diagnosis by the card physicians. Okay. I think you've answered my question. Yeah. I just want to make sure I understand because I think Judge Hurwitz and Judge Christian sort of covered the area that's difficult for me in light of your stipulation that the B-card readers really don't render a diagnosis and the statutory requirement is a diagnosis. So walk me through this checklist again. You did it with Judge Christian, but I want to make sure that I understand your position. I'm looking now at Exhibit 2-1ER16. When there is a notation of only next to the interpretation of B-reader, what is your argument on what that significance is? Because when you go down and it says date of diagnosis, there's no date of diagnosis. Right. Right. So what the- But you're saying it still counts anyway. Well, it counts because the Act doesn't require a clinical diagnosis. So the Act only requires an interpretation by a B-reader. And so what they're saying is this is a person whom we, the clinic, have not made a clinical diagnosis on. However, under the Act, it qualifies as the Act defines diagnosis, it qualifies because a B-reader made an outside interpretation of a radiograph. All right. What's the significance, then, of the date of diagnosis box being left blank? Well, typically, that date of diagnosis is usually the date that the radiograph was examined. That's usually what card filled in. It wasn't- There were- Obviously, when you're dealing with thousands of these forms, sometimes they were filled out incorrectly. No question about that. And so sometimes the date of diagnosis was left blank. Sometimes they checked the wrong box. I mean, those mistakes were made, and most of the time they were corrected. Of the checklists submitted as part of the trial evidence, were there any checklists involving only B-reader patients where the date of diagnosis was filled out? Yes. Almost all of them. I have a different question. Just taking a step back, your brief argues that you think the jury's verdict is accounted for, if I can say it that way, by the B-reader claims. I think there's 112 B-reader claims. At one place, your brief asserts that there were many more than that. But if you were to prevail on this B-reader argument, it seems to me that I'm not sure how we could grant relief to your clients. I want to give you a chance to respond. The first premise I've got is that I don't think we can tell why the jury found liability as to these 337 claims. I have no idea where they based their liability finding. Okay. And yet, your position in your brief is that you think that the B-reader claims account for the verdict, or at least for the bulk of the verdict. I think that if you look at that Exhibit 8 that the railroad provided, this sort of tried to categorize various things, one way of interpreting that is that that was how it happened. Okay. But we don't know. All right. But here's the problem, I think. Another way of interpreting it, and I think you're talking about the tables that they submitted? Correct. Table 7 is 333 claims for which there were negative reads by the outside folks and no positive radiographic reads at all for those folks, not an x-ray, not a CAT scan, only a read by Dr. Black. Correct. Only a diagnosis by Dr. Black. So the problem I have is it seems to me that those 333 may well account for the verdicts. And as to those, unless you can tell me that I'm misreading the tables, and I'll ask opposing counsel as well, it seems to me on those there's no, we've got no B-reader, no CAT scan, no anything. Yeah, we don't know. Yes, that's true. All right. Okay. Judge Hurwitz, do you have additional questions?  No? Counsel, we're going to give you, when you come back you'll have three minutes. We took a lot of your time. Thank you.  I appreciate it. You bet. Good morning, Your Honor. So may it please the Court. I'm Dale Schoengert for BNSF Railway Company. The jury in this case found that Card committed 337 acts of fraud because it systematically signed people up for Medicare who were not sick. Card argued that it had... We don't even know if they found that. Correct. It's tough to know what they found, right? It is. Okay. It is. Some of these people may be sick. That's one of the problems I have. Some of these people may be qualified. You're not asking for us to indicate, for any kind of a ruling, I hope, that says that these individuals are not Medicare eligible. No, I'm not. So what happens to these individuals? That's what troubles me about this case. Let's assume that Card didn't follow the correct policy, that when they got these B Reader claims, they should have tried to make a clinical diagnosis and just didn't because they misread the statute. What do we do with the individuals who got Medicare here? Well, I don't... Some of them... Some of those 330-some were surely qualified to get Medicare, even though the application wasn't appropriate. So does this have any effect on their eligibility to get... There's been no... Medicaid, I'm sorry. ...no indication that they're going to go retroactively and take Medicare. The government was never... declined to join this case. Declined to join this, and there's no indication... Is there nothing in the record suggesting that anybody's benefits that were awarded pursuant to Card's applications have been terminated? Correct, Judge Horowitz. There is no evidence in the record. And let me make one point, Judge Christin, that you mentioned that we don't know whether these folks are diagnosed. There is one piece of evidence, and I think it's important, because it adds different context. It's not like Card was agnostic on these claims. The reason they didn't diagnose these patients was because they had a CT scan of them. And this is at... I missed that last part. They had a CT scan. And Dr. Black... This is at 1 SCR 109 to 113. And Dr. Black talks about the CT scan, you have more clarity, better picture, better resolution, and you can see more. So Card was looking at these CT scans, and they said, we're not diagnosing them because... Counsel, for 333 of the patients, they didn't have a CT scan.  So now you're talking about the universe of Beebeater claims only? Yes. Sorry. That's all right. As to that subset, which I think is 112, something like that? 112, correct. As to those people, your point is what? Those patients, it wasn't just that they had a Beebeater identifying an abnormality. They also had a CT scan. The Beebeaters had the X-ray, but Card itself had a CT scan. Right. They knew that these folks didn't have an asbestos-related disease. That's why they refused to diagnose them. Well, it seems to me we've got categories from your tables that you submitted that show that sometimes Card didn't wait for the Beebeaters. That's right, and that's Table 7. No, that's a different table, but it doesn't matter.  The folks in Table 7, 333, didn't have a CAT scan or an X-ray or any radiographic evidence. That's what the table represents? Correct. Okay. Then there's another group of folks who there was a negative bee read, but Dr. Black thought he could detect something that the radiologist had not and certified those folks for Medicare.  Correct. Then there's another category, sort of subcategory, where there was a positive bee read from the outside readers, I guess. Right? And Card determined that there was no clinical diagnosis for some of those people and sent letters that Judge Hurwitz was mentioning that informed them that you were not diagnosed with an asbestos-related disease, but they were certified for Medicare.  And then there's another category where there was a positive bee read and then Card also diagnosed them and filled out the EHH form and they were also certified for Medicare. Correct. So I can't see a consistent pattern really of how Card reacted to the outside bee reads here. Well, I think Card typically, when they got an outside bee read and it was negative, that's where Dr. Black had said that he had this kind of special ability to see lamellar pleural thickening that no other doctor had diagnosed. There couldn't have been too many of those, sir, because we've got 337 findings of liability here, false claims, right? And for 333 of them, they didn't have anything by way of radiology. Right. And some of those may have been diagnosed with lamellar pleural thickening, but the record's unclear and there may be some categories that... So what are we to do just mechanically with this case? I have another question, but I just want to get your position. Let's assume that we agree with your friend that some mistake was made about the instruction on the bee reader claims. That's 112 of 337, I think. But what do we do? Do we affirm the rest of the verdict? I think you... And send back for further proceedings on the 112? Or do we say, well, we don't know what the verdict was based on and therefore we have to affirm it? What's your position? I think you would affirm because there's substantial evidence that shows that the verdict... There were plenty of other cases, like Judge Tristan mentioned, the Table 7, the 333 alone, where there was no read at all. Even though that's the minimum medical evidence that's required under the statute in the EHH form. There's also the opioid cases and the other examples where...  Given that, given that the 333, we've got no radiology, why are we spending so much time talking about instances where there was a bee read only? Those are the only claims that the Carter's appealed. Well, there's at least four that... There's at least four under that. We'd have to adjudicate. Right. And you... To say that they're the only claims that the Carter appealed, I guess is a... Yes, but these weren't itemized. We don't have a special verdict finding that tells us what the 337 is comprised of. That's right. We don't even know if the 112 are in there. That's right. Okay. I have a question about the 112. Sure. Just so that I'm clear because Judge Tristan is dealing with the chart. He's got a lot of charts and graphs. As to the 112, as to each of them, it was a case in which the card physician says, according to my diagnostic criteria, I haven't diagnosed you with one of the qualifying conditions. That's right. And as to... All of those 112, was the bee reader unequivocal? Or is there some cases in which the bee reader said, I see signs of X or Y or Z, as opposed to, I definitely see X, Y, or Z? In every case, bee readers were clear in this case and this is probably why Cards felt compelled to stipulate to this at ER 92, that bee readers can't diagnose because they only identify abnormalities. Now, the abnormality could be asbestos-related disease, but it could also be a broken rib, emphysema, past thoracic surgery, autoimmune disease. Well, I've seen at least one, and I'm not sure all the bee reader claims are in the record that I'm looking at. Bee readings are in the record. But I've seen at least one that says, X-ray shows pleural thickening, for example. It suggested pleural thickening. I know suggest is what the bee readers say they do, but does the bee reader actually say on the form suggest, or does he just check a box that says pleural thickening? He says pleural thickening and the bee readers that testified said pleural thickening could be a broken rib. It could be all these other things. And Cards stipulated to this, too, at ER 92, that the abnormality could be a specific disease. It could be a number of other things. And that's what the bee readers will tell you. They say, we can't diagnose because we have an X-ray. We don't have patient history. We don't have anything about the patients. It's the idea. No, I was just trying to deal with the form that the bee readers filled out. And the one that I saw just has boxes that you check. It doesn't have a sort of diagnostic description. I checked that box because I saw an X, but I'm not sure it's,  you'll need to explore it further or something like that. I think that's right. They don't give much definition. They just identify the abnormality and let the physician. And that's why the H form itself is not filled out by the bee readers. Bee readers never fill out. So I know this is not the case here, but it's, I'm trying to read what the statute may have envisioned. Could a responsible physician say, okay, I've got the bee reader report. I'm looking at the X-ray too. This person must have one of the qualifying conditions and therefore I diagnose it. If somebody had done that, would that satisfy the statute? I don't think it would. You could go back and attack his diagnosis, but at least on the face of the statute, why wouldn't that work? Because every person that testified in this case that diagnoses asbestos-related disease says you follow those ATS categories. See, that's why I'm asking the question. It gives me some, I'm not sure how I read the A, is it ATF? ATS. ATS. Sorry, I'm thinking of another federal agency. Why I should read the ATS diagnostic criteria into this statute. I mean, if an agency had read that. But for the stipulation. Yeah. Because that's the only way that anyone in this case testified that anyone that diagnoses asbestos-related disease does it. Yeah, but that's not, but step into the realm of statutory interpretation.  Right? And when we look at statutory interpretation, it's quite peculiar for us to look at a statute and say, well, since the party stipulated, this is what the statute means. We don't do that. I think you have to look at the word diagnose. That's what Judge Christensen did. Right. And he's baking in a lot there. And he's looking to this professional organization. That's true. Everybody stipulated and the party stipulated that's how it's done and card stipulated that's how they do it. But as a matter of statutory interpretation, that's not how Judge Christensen got there. Well, I think Judge Christensen first started with Stedman's, you know, what does diagnosis mean? First he started with saying the statute doesn't define it. Right? Yeah. So then he looks at the plain, right, ordinary meaning. Yeah. Looked at Stedman's. Take it from there. And then he looked at Stedman's and said diagnosis means to identify a disease from its signs and symptoms. How do people do that in this specific context of asbestos-related disease? And everyone testified the same way. You do it by these three steps. But after these stipulations, I mean, one of my difficulties with your statutory interpretation argument is let's assume I go to my family doctor and he takes an x-ray and he looks at it and says, you have one of the three qualifying conditions and certifies me as eligible for Medicare. And it turns out I do.  Has he made a false claim?  I don't think he's made a false claim. And look, even the ATS criteria, it's not too hard to do. It's like, have you had a broken rib? Is there other causes? This isn't super complicated to go through those criteria and just eliminate other potential causes. So what's false in the claim that Card made? Card knew, Card relied on B-readers to diagnose when it admitted that B-readers can't diagnose. In other words, it's not just false. To be a false claim, it doesn't have to just be wrong. There's a scienter requirement here. And the jury was instructed us to knowingly, what it takes to knowingly submit a false claim. Not just an incorrect diagnosis, a false one. That's right. F-18, F-20, and the jury was instructed on that and heard lots of evidence that Card knew that these people were not diagnosed. What monies did the government pay out because of the false claim here? Were they payments to Card? Some payments to Card and payments to patients, but yes, Card. Excuse me. Judge Wynn had a question. I had a question. I wanted to follow up on the form that's filled out. I think it's called the E-H-H form. And I'm looking here at the check the boxes form. I think that was the same form Judge Hurwitz was talking about. Plural thickening, plural plaques, and then that box is checked off interpretation by a B-reader qualified physician. And then there's a notation only to it. I'm going to ask you for purposes of this question to set aside the stipulation that B-card readers only categories can't diagnose. And I ask counsel whether the date of diagnosis the form I'm looking at is left blank if there's any significance to that. Because their argument as I understand it is that this for purposes of the statute qualifies as a diagnosis. Counsel said to me the vast majority or almost all of these forms submitted before the jury had the date of diagnosis filled out just from the B-reading results. Is that right? I believe the date of diagnosis was from the provider when they were diagnosing. I'm not sure that that's clear from this record. Would that be Dr. Black? Dr. Black, correct. But not the B-reader. No, the B-reader never fills out this form. But getting back to Judge Wynn's question. Right. The jury saw of the 112 people limiting it to that universe of individuals the date of diagnosis was filled out. Yes, correct. The date of diagnosis was filled out and for those only claims it really didn't tell the Social Security Administration that they were basing that entirely the entire diagnosis was based on that. It certainly didn't tell them that they knew that these people didn't have a diagnosis because they had a superior CT scan.  No, I understand the evidence test trial was beyond that because of the scienter requirement but I wanted to follow up on that just to make sure that I understand their position that the B-card reader only for purposes of the statute qualifies as a diagnosis. Yes, right. That's their argument in this very specific context. Hold on just one second. Mr. Hurwitz, did you get your question finished? I think I did. Okay. Did you have any closing thoughts? Thank you very much. We'd ask you to affirm the jury's verdict. Sure. Thank you. Madam Clerk, could you put three minutes on? Thank you so much. You read my mind. Thank you. Go right ahead. One thing you asked about how much money has been paid out. The practical matter is SOCARD declared bankruptcy after this and the United States came in and entered into a settlement with the railroad and CARD where CARD pays nobody anything. The United States said that the CARD's assets are held in trust for the United States. The United States has subsequently granted CARD another four-year grant for more screening. So, if you look at the materiality requirement here, what the government does in response to this, the government has said business as usual.  but that's all post-trial. It seems to me you didn't contest below that if a inadequate claim if the claim wasn't a diagnosis that there wasn't liability, right? Your argument was,  even if this wasn't a diagnosis, we shouldn't be liable because it wasn't material. We certainly did contest materiality. But that was tried? Yeah, absolutely. But I don't read your brief on appeal arguing that as a matter of law there was no materiality. Sure, look at page 19 of our opening brief. We certainly argued that there was no materiality. Because why? Because the government's response, if you look under winter you say? Because the government did what? Because the government, so you have to look on how the government responds to the supposed false claim, right? So is this so central that the government would not have paid the money had it known that the  claim wasn't   true? Yeah, and that apparently has changed as well because the SSA is... This is what was in front of the  right? It was, and so was the ATSDR's testimony to say absolutely this is what we expected to do. But the ATSDR doesn't speak for the Social Security Administration and they're not the ones paying the claim. That was a  The ATSDR is the only money involved. No, but in terms of the federal government witness, this is the Social Security that said she would not have authorized this. That's what she said. So doesn't that make, doesn't that provide evidence from which a reasonable finder of fact could find materiality? They could, but what the district court instructed the jury to was to ignore the government's testimony from the ATSDR. The witness from the ATSDR wasn't in a position to speak for the agency and he also testified that he wasn't aware that they were doing this particular billing practice. He said he read the statute the same way. Oh no, he said, Ted Larson, is that who you're talking about? Yeah, so Mr. Larson testified that he was aware that CARD was submitting EHH checklists based upon beread only. I think there's at least conflicting evidence in the record about that, but what is your position for the more central point, which is that if he agreed with you, let's say, and your read of the statute, that he would be in a position to bind the agency? I think that's where you have to be. Well, he's the one who supplied all the money. So this is, I want to understand your position. Your position       the false statements were not material? They couldn't have been material because, as I said, they were doing what the ATSDR told them to do. That's a separate argument about reliance on the   just remember that one of the claims that the railroad brought was that the card was defrauding the ATSDR. So that could have been one of the 337 claims. We don't know. But they certainly made that claim at  They were defrauding the ATSDR by falsifying their reports. The jury had a  opposing counsel. I think we just went through this. It was instructed that this false claims act requires a showing of scienter. What it means that the folks had to knowingly submit false claims. There's a detailed instruction at 18 and 20 about what that required, including putting your head in the sand. I'm only using that phrase because the instruction does. There are different ways to show  your  There are 337 findings, correct? Of those, we don't know of those, but there were 333 non-B reader only cases. Am I correct? As to those, aside from your arguments about jury instructions, is there any problem with them? In other words, let's assume you read the statute entirely correctly. A B reader reading is enough. But as to some 330 some, there wasn't a B reader reading on what you could have been based. As to those, there was some evidence that that wasn't really CARD's diagnosis. As to those, is there a problem with those? What's the problem with those? The problem is that the statute says that a diagnosis by the CARD qualifies under the  Right, but a false diagnosis by CARD doesn't. As to those, there seemed to be evidence that with respect to at least some of them, the CARD doctor really didn't make the diagnosis. And so, if that was the evidence, is there any problem with a finding of liability as to those? Leave aside for a second how we sort out the whole mess, but what's your argument as to those? Well, what the statute actually says is that it's a CT interpretation by a  physician, and that as defined by the  And the  has defined CARD diagnosis. Let's assume this is probably not the record, but I think it's close. The CARD doctor says, eh, the B reader doesn't show anything, and I don't see much either, but what the heck, I'll certify you. That violates the statute, does it not? That would, but you should know as a practical matter, after the CARD physicians see a  they send out the  and then they send out the CTs. So those outside reads do not come back to the CARD clinic for review. Those are they're kept for statistical purposes by ATSDR. They're not there for diagnostic purposes, for clinical diagnostic purposes, but they qualify under the act. So the CARD physician doesn't, they don't get a report back to say patient X now has a  positive outside read. The CARD physicians don't, I mean they don't respond to that. They just say okay he's okay he got positive outside read then he qualifies under the act. Send it in. I just have one final question. As to the 333 claims for which there is no radiology, how could they possibly satisfy the  The statute requires radiology. Thank you both for your advocacy. We're going to take, we genuinely appreciate your help. This is an important case and we'll take our time with it but get to a decision just as soon as  We're going to stand in recess for about five minutes and we'll come back for the final argument. Thank you.
judges: CHRISTEN, NGUYEN, HURWITZ